**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

PATRICE L. BICKHAM,

                              CASE NO. 16-cv-13302

         *Plaintiff*,               MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant.*

_____/


**OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**
**(Docs. 14, 19)**

**I.**      **OPINION**

      **A.**     **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Patrice L. Bickham's ("Bickham") claim for a period of disability, Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 19).

On October 9, 2013, Bickham filed concurrent applications for DIB and SSI, alleging a disability onset date of May 7, 2012. (Tr. 182-91). The Commissioner denied her claims. (Tr. 89-110). Bickham then requested a hearing before an Administrative Law

Judge ("ALJ"), which occurred on June 25, 2015, before ALJ Stephen Marchioro. (Tr. 29-88). At the hearing, Bickham—represented by her attorney—testified, alongside Vocational Expert ("VE") Paul Delmar. (*Id.*). The ALJ's written decision, issued September 18, 2015, found Bickham not disabled. (Tr. 12-23). On August 9, 2016, the Appeals Council denied review, (Tr. 1-6), and Bickham filed for judicial review of that final decision on September 13, 2016. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy

that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Bickham not disabled under the Act. (Tr. 12-23). At Step One, the ALJ found that Bickham last met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity in the interval between her alleged onset date of May 7, 2012 through her date last insured ("DLI") of December 31, 2017. (Tr. 14). At Step Two, the ALJ concluded that the following impairments qualified as severe: epilepsy, status-post repair of a ruptured posterior tibial tendon of the left ankle, and osteoarthritis. (Tr. 15). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 15-16). Thereafter, the ALJ found that Bickham had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [S]he must be able to alternate between sitting and standing while remaining at her workstation. She can stand for thirty minutes, sit for 120 minutes, and walk for ten minutes at a time. The claimant can occasionally push or pull with her bilateral upper extremities. She can occasionally operate foot controls with her left lower extremity. She can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. She can never crawl. The claimant can never climb ladders, ropes, or scaffolds. She can occasionally reach overhead bilaterally. She must avoid all excessive vibration and unprotected heights. She must avoid all use of moving mechanical parts and can never operate a commercial vehicle.

(Tr. 16). At Step Four, the ALJ noted Bickham's past relevant work as a fast-food worker and manager, but noted that the VE "did not testify as to whether the claimant could perform her past relevant work," and that such information was "not material because all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not

disabled' given the individual's age, education, past relevant work, and residual functional capacity." (Tr. 21-22). Proceeding to Step Five, the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (Tr. 22-23).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Bickham's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Function Report

Bickham filled out a Function Report on November 25, 2013, which appears in the administrative record at issue. (Tr. 246-258). Describing her conditions, she noted daily seizures, hand tremors, severe left foot pain, and insomnia (which, in turn, helped to trigger her seizures). (Tr. 246). They disturbed her sleep on a regular basis. (Tr. 247). In a typical day, Bickham would clean the house, prepare meals, do laundry, and perform other daily house chores, resting between activities. (*Id.*). She noted no problems performing a variety of self-care activities listed in the questionnaire. (*Id.*). Before the onset of these conditions, she indicated that she could work nine to ten hours a day, and forty hours a week. (*Id.*).

She affirmed an ability to cook soup and make sandwiches on a daily basis, though doing so often took up to three hours. (Tr. 248). Her foot pain interfered with her ability to stand while cooking. (*Id.*). "My sons help make dinner." (*Id.*). Her sons also helped her

with all cleaning. (*Id.*). She spent about an hour each day cleaning. (*Id.*). Her sons did all the yard work. (Tr. 249).

Bickham left the house once a month "to get groceries" for an hour, and rode in the car rather than driving; she had no driver's license and her left foot pain and seizures made driving both difficult and dangerous. (Tr. 249). She remained capable of counting change, handling a savings account, and using a checkbook or money orders, though she could not pay bills because she could not drive or work. (*Id.*). Although she enjoyed puzzles and crafts as a hobby, she only did it once a year as her "hand tremors make everything harder." (Tr. 250). She made time daily to see friends. (*Id.*). Even so, she indicates that she "became anti-social as a result of my seizures and sore foot." (Tr. 251).

Prompted to mark areas of difficulty with respect to specific abilities, Bickham marked: lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, and using hands. (*Id.*). She could walk up to one block before needing to rest for fifteen minutes. (*Id.*). Stress triggered her epilepsy, and she noted a new fear of stairs. (Tr. 252). She could also, however, pay attention for "as long as needed" and follow written or spoken instructions "[v]ery well." (Tr. 251).

Justin Bickham—Bickham's son—also filled out a Third-Party Function Report on December 2, 2013. (Tr. 265-75). The information provided therein remains consistent in all relevant respects with that provided in Bickham's Function Report.

### ii.    Bickham's Testimony at the Administrative Hearing

Bickham opened her testimony noting that though she could not drive, she previously used public transportation to get around. (Tr. 38). She could no longer do this,

however, as "I can't walk to the bus stop." (*Id.*). She used to work at Rally's restaurant in "2013 or 2012," and worked for a time in a "seasonal job" at Home Depot, though she eventually "had to quit due [to] my seizures." (*Id.*). Before quitting her job at Rally's in 2012, she had worked there for about ten years. (Tr. 40). She originally quit after five years due to seizures, but then returned when her doctor "had gotten my seizures under control." (Tr. 41). When she quit again in 2012, it was due to a fall in which she tore her "tibial tendon." (Tr. 42). But she clarified that "the main reason I had to quit is my doctor just said you cannot work there anymore. That is just too much responsibility for your seizure condition." (*Id.*). Upon questioning by the ALJ, she clarified further: her doctor "gave me a work limitation at first and my boss said he would work with me, but when it came down to it my boss refused to work with me." (Tr. 43).

Her medications helped with her pain, but "because I am epileptic and I am on seizure meds," her doctor did not want to overburden her with other pain medication, and thus "I still have a lot of pain for my arthritis." (Tr. 46). "I am still having seizures and I still have severe neck pain and shoulder pain." (*Id.*). In October, she had been hospitalized due to her left shoulder pain, and an MRI revealed foraminal "narrowing" and "arthritis." (Tr. 47). She also noted migraines occurring three to four times a week. (Tr. 65).

Bickham then described the surgeries she endured on her left foot: a bunionectomy and another procedure to repair her "torn posterior tendon." (Tr. 49). Her pain flamed up frequently and "I still don't have the use of my foot properly. . . . I can't even walk. I live in a trailer park. I can't even walk down to the mailboxes." (Tr. 50). At most, she could "only stand anywhere from 20 to 30 minutes a day . . . ." (Tr. 63). And her condition existed

despite, as she testified, complying with her doctor's post-surgery instructions. (Tr. 50). The ALJ noted, however, that records showed Bickham had borne weight after the surgery, had not acquired a walker as recommended, and ceased using the crutches granted her; all of which violated the instructions given her. (Tr. 51). Nevertheless, she indicated that "I couldn't walk on crutches" due to her seizures. (Tr. 52).

Questioned about her seizures, and how she managed to work for as many years as she did while suffering from them, Bickham indicated that though "I had seizures at work" she "covered them up, because I was so embarrassed, because people – you know, everybody would laugh at me." (Tr. 55). Eventually, and due to the frequency with which she was called in to work (as she worked across the street from the restaurant), "[i]t just got too much for me and it was a seizure trigger." (Tr. 56). Her seizures occurred without warning, and had caused injury in the past. (Tr. 57). "If I didn't take the medicine, it probably would be far worse." (*Id.*). Sleep deprivation and stress were "major trigger[s]" for seizures. (Tr. 58). She suffered petite mal seizures three to four times a day, depending on the day, as well as infrequent grand mal seizures. The last grand mal seizure she endured occurred "because of the nerve block wore off and the doctor didn't send me home with the proper medication" the prior June. (Tr. 60).

Wrapping up her testimony, Bickham highlighted several specific difficulties she encountered. Standing proved difficult because she either had to place some weight on her left foot or overburden her right foot in order to remove the burden on her left foot. (Tr. 68). She had trouble lifting her arms above her head, which made dressing difficult. (Tr. 69). She could walk "a half a block and I usually have to stop to sit down. I am one of those

people that is definitely going to end up with a cane." (*Id.*). Her sons helped her cook, clean, and do the dishes, among other things. (Tr. 70).

### iii. The VE's Testimony at the Administrative Hearing

The VE began by classifying Bickham's past relevant work as a fast food worker—light, unskilled, and with an SVP of 2—as well as assistant manager—skilled, light as per the DOT but medium as performed, and with an SVP of 4. (Tr. 73-74). The ALJ then asked the VE his first hypothetical: "[T]his hypothetical person can do light work as defined by the regulations. This person would be able to push or pull with the bilateral upper extremities only occasionally. They could only operate foot controls with the left lower extremity occasionally. This hypothetical person could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. This person would have to – or could only be occasionally . . . exposed to excessive vibration. But would have to avoid all use of unguarded moving mechanical parts, avoid all exposure to unprotected heights, and avoid all operation of a commercial vehicle. Would such a hypothetical person be able to perform the claimant's past relevant work as it was actually performed or as it was described in the Dictionary of Occupational Titles?" (Tr. 75). The VE believed that such a person would be able to find work, both in past jobs as well as in others. (*Id.*). These occupations included: routing clerk—with 35,000 regional job availabilities and 300,000 national job availabilities—general clerk—with 40,000 regional job availabilities and 500,000 national job availabilities—and office helper—with 50,000 regional job availabilities and 500,000 national job availabilities. (Tr. 76).

The ALJ then posed a second hypothetical to the VE involving "the same residual functional capacity in hypothetical number one with" additional limitations that she "be limited to employment, that [sic] would allow them to alternate between sitting and standing. If they could sit – and they could stand for 30 minutes. In fact, they would be able to sit up to 120 minutes, while remaining at the work station. Additionally, if this hypothetical person could never crawl – this person would be limited to reaching overhead. . . . bilaterally, only occasionally. And this hypothetical person would have to avoid all exposure to excessive vibrations. Would there be any jobs in the national economy that such a hypothetical person could perform at the light exertional level?" (Tr. 76-77). The ALJ clarified that this person "would need to walk for 10 minutes" at a time as well. (Tr. 77). The VE identified a number of jobs in response: routing clerk—reduced to 6,000 regional job availabilities and 75,000 national job availabilities—general clerk—reduced to 7,500 regional job availabilities and 80,000 national job availabilities—and office helper—reduced to 8,000 regional job availabilities and 85,000 national job availabilities. (Tr. 78).

In the ALJ's third hypothetical, he added limitations to those presented in the first and second hypotheticals: "the hypothetical person can never stoop and can never crouch. Would there be any jobs at the light exertional that exist for a person who with all the other limitations we have talked about could never stoop and never crouch?" (Tr. 79). The VE confirmed that the answers given for hypothetical number two still applied when adding these limitations. (Tr. 80).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR

96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

In her brief, Bickham presents two overarching arguments: (1) the ALJ's RFC lacks the support of substantial evidence—a defect requiring reversal; and (2) the ALJ's Step Four analysis, or lack thereof, similarly taints the decision and requires reversal. I address each argument in turn.[1]

---

[1] Bickham's testimony reveals that she applied for disability benefits for her seizure disorder three times before—in 1995, 2001, and again in 2012. (Tr. 43-44). The ALJ does not discuss these former applications, and does not include any mention of the *res judicata* standard applicable in the Social Security context; neither do the parties contend that the ALJ applied the wrong standard. And because I find that substantial evidence supports the ALJ's determination that Bickham is not disabled, any error on this count would be harmless, as claimants' burden under the standard applied by the ALJ is more lax—an adverse finding thereunder would, *a fortiori*, remain adverse under the more exacting *res judicata* standard. For this reason, I decline to address this issue any further.

### 1.    The RFC

Bickham's argument with respect to the RFC contains three components: (i) the ALJ mistakenly categorized her work capacity as measuring up to "light work" rather than "sedentary work," (Doc. 14 at ID 528-29); (ii) the ALJ declined to perform a function-by-function analysis as required by SSR 96-8p, (Doc. 14 at 529-34); and (iii) the ALJ improperly found her able to bend, contrary to medical evidence she could not bend, thereby defeating her otherwise valid claim of disability, (Doc. 14 at ID 535-39). Each assertion lacks merit.

### i.    Light Work

As Bickham points out, a full range of light work requires "a total of approximately six hours out of an eight-hour workday to either stand or walk," as well as "stooping occasionally for at least one-third of the workday." (Doc. 14 at ID 528). Indeed, the ALJ did not find her capable of doing this, instead reasoning that she could "stand for thirty minutes, sit for 120 minutes, and walk for ten minutes at a time." (Doc. 14 at ID 529); (Tr. 16). But simply because the ALJ found Bickham incapable of a *full* range of light work does not mean he found her only able to perform sedentary work—the ALJ plainly limited Bickham to a *limited* range of light work. *See Lambert v. Comm'r of Soc. Sec.*, 2010 WL 546756, at *4 (N.D. Ohio Feb. 11, 2010) ("[The claimant] incorrectly argue[s] that the ALJ had to show [she] was able to stand or walk for six hours in an eight-hour workday. This ability is required to perform a *full range* of light work. The ALJ found, however, that [the claimant] could perform a *limited range* of light work at jobs of significant number in the national economy. A limited range of light work does not require this standing and walking

17

durational requirement." (internal citations omitted)). Where, as here, the ALJ finds "a claimant's RFC is in between two exertional levels, . . . the grid guidelines, which reflect only common—and not all—patterns of vocational factors, are not binding and are instead used only as an analytical framework." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *accord Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 680-81 (6th Cir. 2013) ("When a plaintiff's residential functional capacity is not squarely within either grid, the grid guidelines are not binding and instead are used only as an analytical framework."). In this scenario, the VE's testimony may assist in the ALJ's determination "[a]s long as [it] is in response to an accurate hypothetical." *Id.*

Citing the "math" in the ALJ's RFC—*i.e.*, suggesting that it *requires* Bickham to sit 75% of an eight-hour workday "which is sedentary work," and *requires* Bickham to stand or walk for 25% of an eight-hour workday which "is also sedentary work"—Bickham avers that the "math simply does not add up to an ability to meet the standing or walking requirements of light work . . . ." (Doc. 14 at ID 529). *See generally* SSR 96-9p, 1996 WL 374185, at *3 (S.S.A. July 2, 1996) ("The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday."). As the Commissioner notes, however, the RFC does not *require* Bickham to "stand for thirty minutes, sit for 120 minutes, and walk for ten minutes at a

time," (Tr. 16), it simply notes the maximum amount of time that Bickham can sit, stand, or walk in any given interval. And ultimately, the fact that the RFC appears amenable to various light and sedentary jobs remains inconsequential. *See Branon*, 539 F. App'x at 681 ("An individual who is limited to light work can generally also perform sedentary work and this does not require or indicate any change to that individual's residual functional capacity.").

For this reason, the ALJ's provision of light work, as opposed to sedentary, does not alone support finding error in the ALJ's conclusions. To prevail, Bickham would also need to show that the ALJ lacked the evidentiary support for his RFC, as well as his finding at Step Five that Bickham can perform a significant number of jobs in the national economy. *See, e.g.*, *id.* at 680 (where a claimant's RFC falls between grids, the ALJ must consult a VE "to testify as to whether a significant number of jobs exist in the national economy that a hypothetical individual with plaintiff's limitations can perform"). As discussed at length below, Bickham cannot fulfill this burden.

### ii. Function-by-Function Analysis

Bickham also avers that the ALJ's opinion omits any "articulation linking the medical evidence to the functional limitations imposed in the RFC required by SSR 96-8p," opting instead to provide a detached "five-page *factual* summary . . . ." (Doc. 14 at ID 530). In Bickham's estimation, such error warrants reversal. (Doc. 14 at ID 534).

In accordance with SSR 96-8p, as Bickham suggests, an RFC must provide a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," for failure to adequately capture all of an individual's

limitations "could result in the adjudicator overlooking" some of them. 1996 WL 374184, at *3-4. "[T]he court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the results." *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-CV-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011), *report and recommendation adopted,* No. 09-CV-14438, 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) (quoting *Ramos v. Astrue*, 674 F.Supp.2d 1076, 1080 (E.D. Wisc. 2009)). "A 'cursory' or irrelevant analysis, for instance, fails to provide a logical bridge between the evidence and the conclusion." *Weaver v. Comm'r of Soc. Sec.*, No. 16-CV-10942, 2017 WL 1212995, at *11 (E.D. Mich. Jan. 20, 2017), *report and recommendation adopted,* No. 16-CV-10942, 2017 WL 1055543 (E.D. Mich. Mar. 21, 2017) (quoting *Samona v. Comm'r of Soc. Sec.*, No. 2:15-cv-11713, 2016 WL 3951420, at *7 (E.D. Mich. June 24, 2016).

The analysis at issue, however, proves thorough and easily traceable. Contrary to Bickham's supposition, the ALJ drew numerous, and plain, connections between the medical evidence and the limitations provided for in the RFC, including for example: (a) that Bickham "can stand for thirty minutes, sit for 120 minutes, and walk for ten minutes at a time," (Tr. 16)—*e.g.*, (Tr. 17) ("The claimant estimated that she could stand for twenty to thirty minutes at a time . . . ."); (Tr. 18) ("The claimant estimated she could walk for thirty minutes and stand for thirty minutes."); (Tr. 19) ("Subsequent examining physicians observed that the claimant ambulated with a normal gait."); (Tr. 20) ("In December 2013, she demonstrated normal gait . . . ."); (b) that Bickham "can occasionally push or pull with her bilateral upper extremities," (Tr. 16)—*e.g.*, (Tr. 18) ("She retained normal grip strength

bilaterally."); (Tr. 20) ("In December 2013, she demonstrated . . . normal function, strength, and range of motion in all extremities."); (c) that Bickham "can occasionally operate foot controls with her left lower extremity," (Tr. 16)—*e.g.*, (Tr. 18) ("[S]he described the pain [in her left foot] as mild and acknowledged that the pain did not limit her activities."); (Tr. 19) ("On post-surgical follow-up, the claimant reported improvement in pain . . . ."); (Tr. 20) ("[I]n May 2012, the claimant reported that her foot pain was mild and did not limit her activities."); (d) that Bickham can "occasionally climb ramps and stairs, balance, stoop, kneel, and crouch," (Tr. 16)—*e.g.*, (Tr. 20) ("[Dr. Nims] stated that the claimant's ability to bend, stoop, lift, walk, crawl, squat, carry, travel, push, and pull heavy objects was 'mildly' impaired."); (Tr. 21) (lack of difficulty "performing her own self-care and" her ability to "prepare meals, launder, and shop in stores" was "inconsistent with a finding that the claimant could never squat or bend"); and (e) that Bickham "can occasionally reach overhead bilaterally," (Tr. 16)—*e.g.*, (Tr. 19) ("On exam, Dr. Akbar noted that the left shoulder movement was somewhat limited due to pain. She assessed the claimant with osteoarthritis of multiple sites, including the left shoulder.") (internal citation omitted); (Tr. 20) ("Dr. Akbar noted only some reduced range of motion of the left shoulder."). Further, the ALJ indicated why he declined to provide limitations for Bickham's seizures, namely that though "she has always had seizures . . . she could 'cover them up' at work" and "admitted that she could work through those episodes." (Tr. 20). The record buttresses these findings. *See, e.g.*, (Tr. 55) ("I had seizures at work, but I just – I covered them up, . . ."); (Tr. 350-51, 363, 431, 467) (normal gait, normal motor strength); (Tr. 379) (low pain in left foot); (Tr. 431, 441) (little or no pain in neck); (Tr. 352) (mild difficulty bending,

stooping, lifting, walking, crawling, squatting, carrying, and traveling). And in explaining the RFC's contents, the ALJ did not hesitate to cite this evidence extensively. *See generally* (Tr. 17-21).

Bickham's objection on this count, therefore, proves unavailing. The Court should find as much.

### iii.    Ability To Bend

Pointing to potential "confusion whether the ability to bend was incorporated within the RFC," Bickham supposes that the VE's answers do not clearly address whether the ALJ incorporated "bending" into the definitive hypothetical—partly because "Dr. Nims' [sic] report did not use the same terms as the ALJ." (Doc. 14 at ID 535-36). In addition, Bickham identifies evidence that she could not bend. (Doc. 14 at ID 537). Coupling the VE's ambiguous testimony with the ALJ's "[s]elective[] omi[ssion]" of "clarifying evidence," Bickham contends that such errors demand reversal. (*Id.*).

As an initial matter, the transcript of Bickham's hearing betrays none of the bending-versus-stooping confusion she alludes to now. The ALJ noted that "stooping" is the "vocational term" for "bending." (Tr. 83). And the portion of the transcript Bickham cites refers to a colloquy in which the ALJ asked the VE whether limitations as to stooping or crouching—the third hypothetical—affected the job numbers given for the second hypothetical. (Tr. 79-80). (The VE indicated that stooping and crouching limitations would not change the job numbers.) (Tr. 80). With this, Bickham's concern as to ambiguity in the VE's testimony evaporates.

Regarding Dr. Nims's opinion, Bickham likewise cannot point to error in the ALJ's reasoning. Indeed, the ALJ poured considerable ink into explaining why he did not grant more weight to Dr. Nims's assertion—on a check-box form—that Bickham could neither bend nor squat. (Tr. 20-21). The report Dr. Nims submitted following his medical evaluation described Bickham's ability to bend, stoop, lift, walk, crawl, squat, carry, travel, and push and pull heavy objects as "mildly impaired . . . ." (Tr. 352). The later check-box form he submitted, and upon which Bickham relies, conflicts markedly with his in-depth report in suggesting that she could not bend or squat. Discounting the latter in favor of the former remained firmly within the ALJ's prerogative. *Accord, e.g.*, *Hernandez v. Commissioner of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) ("We have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation."); *Pelak v. Comm'r of Soc. Sec.*, No. 1:16-CV-198, 2016 WL 6694477, at *7 (W.D. Mich. Nov. 15, 2016) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)) (internal quotation marks omitted)). This seems particularly so where, as here, the claimant's own statements validate the ALJ's choice. (Tr. 247) (admitting an ability to perform "[d]aily house chores," "do laundry," and perform self-care activities).[2] Substantial evidence underlies the ALJ's finding that Bickham could occasionally stoop (*i.e.*, bend).

---

[2] Bickham's suggestion that she did not admit to these tasks, (Doc. 14 at ID 538), is not well-taken. To suggest that she merely indicated she needed no "special reminders" for self-care activities, though technically true, (Tr. 248), proves immensely misleading, for Bickham baldly marks "NO PROBLEM with personal care" on the previous page of the questionnaire. (Tr. 247). Likewise, the fact that the ALJ did not copy, verbatim, Bickham's description of her daily activities—as Bickham eagerly points out, (Doc. 14 at

For these reasons combined, Bickham's argument as to the ALJ's RFC should fail.

## 2. Step Four

Bickham next notes that "the ALJ simply forgot to ask the [VE] the Step Four question relative to the hypothetical that was ultimately adopted . . . ." (Doc. 14 at ID 534). This constituted reversible error because "the ALJ has failed to articulate how a light RFC was arrived at by failing to link the record evidence with [his Step Five] conclusion." (Doc. 14 at ID 535). As discussed at length above, however, Bickham cannot trace error to the ALJ's Step Five analysis, and her concerns as to the ALJ's RFC remain misguided. Even assuming error at Step Four, such error would be harmless. *Accord, e.g.*, *Siple-Niehaus v. Comm'r of Soc. Sec.*, No. 5:15-CV-01167, 2016 WL 2868735, at *18 n.16 (N.D. Ohio May 17, 2016) ("Since there is no error regarding the ALJ's Step Five finding, error, if any, at Step Four would be harmless. Thus, it is not necessary for the Court to address Siple-Niehaus's Step Four argument."); *cf. Patton v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14493, 2011 WL 4345293, at *4 (E.D. Mich. Aug. 1, 2011), *report and recommendation adopted*, No. 10-14493, 2011 WL 4345232 (E.D. Mich. Sept. 16, 2011) ("Once it is determined that an applicant can perform past relevant work at step four . . . it was unnecessary to continue the sequential evaluation to determine whether he could perform other jobs at step five. He is deemed not disabled and there is no need for the testimony of a vocational expert or consideration of the Medical-Vocational Guidelines." (citing *Orick v. Sullivan*, 966 F.2d 368, 372 (8th Cir. 1992))). To the extent Bickham obliquely attacks the ALJ's specific

---

ID 538)—detracts not a whit from the fact that she admits an ability to do laundry, prepare meals, and shop in stores in the same document.

findings at Step Five, however, the Court should consider her argument waived. *E.g.*, *Paul v. Comm'r of Soc. Sec.*, No. 2:13-CV-14911, 2015 WL 1299980, at *11 (E.D. Mich. Mar. 23, 2015) ("[P]laintiff cannot simply make bald claims that the ALJ erred, while leaving it to the Court to scour the record to support this claim. And, 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (citation omitted)).

### H.     Conclusion

For the reasons stated above, the Court finds that the ALJ's decision, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

## II.     <u>ORDER</u>

In light of the above findings, **IT IS ORDERED** that Bickham's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 19), be **GRANTED**, and this case be **AFFIRMED**.

Date: May 15, 2017                                    <u>S/ PATRICIA T. MORRIS</u>
                                                      Patricia T. Morris
                                                      United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 15, 2017                                By s/Kristen Castaneda
                                                                  Case Manager